## PEOPLE v. MURPHY.

(Supreme Court, Special Term, Erie County. May, 1911.)

1. MUNICIPAL CORPORATIONS (§ 174*)—PUBLIC OFFICIALS—UNJUST CLAIMS—DISHONEST APPROVAL—LARCENY.

Where a town engineer approved a contractors' claim for extras not in the honest belief that the extras had been in fact furnished and in spite of a prohibition of the contract that extras not ordered in writing should not be allowed, and the contractors thereby obtained payment for such amount from the town, the engineer was guilty of grand larceny.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 174.*]

2. CRIMINAL LAW (§ 945*)—NEW TRIAL—NEWLY DISCOVERED EVIDENCE.

In a prosecution of a town engineer for grand larceny in the approval of a contractors' claim for extras not furnished, documents produced after conviction, tending to show that defendant approved the claims in good faith, honestly believing that the extras had been in fact furnished and that the claim had been allowed by his predecessor in office, *held* forged, and therefore unavailable in support of a motion for new trial for newly discovered evidence.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2324–2327, 2336; Dec. Dig. § 945.*]

Daniel W. Murphy was convicted of grand larceny, and applies for a new trial. Denied.

Charles A. White and Wallace Thayer, for the motion.
Wesley C. Dudley and Guy B. Moore, opposed.

BROWN, J. The jury was charged that if Murphy honestly believed that he had a right to waive the strict letter of the contract and audit a claim for extras that had been furnished, without first obtaining a written order from the town board before such extras were furnished, then he could not be convicted. The defendant was convicted upon the theory that he did not honestly believe that the extras had in fact been furnished and that he could allow the same in spite of the prohibition of the contract.

[1] The evidence on the part of the people abundantly justified the finding of the jury. The proof on the part of the defendant on his trial that he approved the claims in the honest belief that they were just consisted of his testimony that he had been advised by the previous engineer of the town that the extras had in fact been furnished; that his assistant engineer had gone over the work and made an estimate of the quantity of concrete in the ground and ascertained that there were 102 yards more than the contract called for; that two engineers had measured and estimated the extra material and found that more than $2,960 worth had actually been furnished that had not been paid for; that Daniel W. Allen, the attorney for the town, had stated to him (Murphy) that, the extras having been furnished, the bill should be paid; that the same was paid with Mr. Allen's full consent; that Mr. Allen knew that no written order had been given by

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the town board for the extras before the work was done and the materials furnished.

Defendant now moves for a new trial upon the ground that since the trial he has discovered, and produced upon this motion, several letters and documents which strongly tend to establish that the prior engineer in charge at the time the alleged extras were furnished had duly approved the claim of the contractors, amounting to upwards of $4,000, for these same extras and advised defendant, Murphy, to allow the same; that one of the contractors, Battles, objected to the final estimate of March 26, 1908, rejecting the claim of upwards of $4,000, and announced his intention of suing the town unless such claim for extras was allowed; that defendant wrote to the attorney for the town, stating that the former engineer had approved the claim, and asking his opinion as to whether the clause in the contract prohibiting an allowance for extras unless on order of the town board, made before the extras were furnished, could be waived, and whether the claim of $4,272 in question ought to be allowed; that the town attorney replied to defendant by letter advising that the clause in the contract had been nullified; that, as the extras had in fact been furnished, the town was liable for the same, and the claim ought to be allowed; that thereupon defendant went over the items of the claim, deducted over $1,700 therefrom for deficiency in quantity of concrete and lumber reported by his assistant engineer, leaving a balance due of $2,690, submitting the sheet showing such deductions to his assistant engineer, and, as now asserted by defendant, such revised estimate was marked by his assistant engineer: "March 31—O. K. C. W. G." Thereupon, and on April 8, 1908, the defendant approved the claim for $4,272 for extras over and above the contract requirement at the sum of $2,690. It is for the larceny of this $2,690 that defendant has been convicted. The work and materials that constituted the alleged basis for this allowance had all been furnished months before the defendant became town engineer or was connected with the town improvement work.

The letters from Contractor Battles, Engineer Fairchild, Attorney Allen, and the estimate sheet apparently approved of by Engineer Getman are of such grave importance as bearing on the good faith of the defendant that it is impossible to reach the conclusion that, if they are genuine, and full credit be given to them, a different result in all probability might not be expected upon a new trial. The present engineer of the town was sworn upon the hearing of this motion. He stated that the initials "C. W. G." upon the pencil estimate sheet were not his genuine initials; that he never placed them thereon. He admitted, however, that he has stated to defendant's attorney that they appeared to be his initials, saying that he simply meant to be understood as saying to defendant's attorneys that they were his initials, but not that he made them. Two witnesses testified that Engineer Getman admitted to them that he wrote the initials. The former town attorney, Daniel W. Allen, died in 1909. His law partner testified that the important letter here produced is signed with the genuine signature of Daniel W. Allen. The same witness states that the sig-

natures of Town Engineer Fairchild to the papers purporting to be issued by him are genuine. It is thus clear that the execution of these documents has been sufficiently established to entitle them to be read in evidence.

The explanation of defendant why these important documents were not produced upon his trial is as follows: He was advised by his then attorney that his acquittal would depend upon his ability to establish that the materials constituting the basis for the claim for extras had in fact been furnished, and that they were necessary for the completion of the work in a first-class and workmanlike manner; that he devoted all his time in procuring proof of such facts, and that it did not occur to him that these documents would be of any service; that he forgot the existence of such documents until after his conviction, and then only had his attention called to them by his wife's bringing to him while he was in jail a carbon copy of a letter written by defendant to Engineer Fairchild on March 27, 1908; that defendant's wife had been asked to look for some papers relating to a proceeding in Surrogate's Court, and while looking for such papers she found the carbon copy; that upon receiving the carbon copy of such letter the defendant then for the first time recollected the fact that he had had correspondence with Engineer Fairchild as to the validity of the claim for extras that he had approved April 8, 1908. It is claimed by the defendant that his office effects were moved from one office in Ellicott Square to another office in the same building; that from this second office they were moved to a barn on Seventh street, and later to a barn on Niagara street; that while defendant's office effects were stored in the Niagara street barn a fire occurred there; that the contents of the building were soaked with water and partially consumed; that his papers were in boxes and barrels, indiscriminately mixed; that after the fire they were moved to the basement of Carmichael flats, in which place the first paper was found by his wife after conviction and before his release on a certificate of reasonable doubt; that after defendant's release on bail he, in company with his wife, diligently examined the papers in the Carmichael flats, found some of the Fairchild papers, and later found the Allen letter, and months afterwards found the letter from defendant to Attorney Allen, which was found in the office of the late Daniel W. Allen misplaced in a letter file under the wrong filing letter. George H. Rowe, the managing clerk in the office of the former partner of the late Daniel W. Allen, states that the letter from defendant to Mr. Allen was found by him (Rowe) in company with the defendant, in Allen's letter file November 9, 1910.

It is very apparent that if the firm of Laurence Savage & Co. threatened to sue the town of West Seneca to recover upwards of $4,000 for extras rejected by the March 26, 1908, estimate; if the defendant advised Town Attorney Allen of this fact; if former Engineer Fairchild approved the claim, and both Engineer Fairchild and Attorney Allen advised the defendant in writing that the claim of $4,272 for extras was just and should be paid, and that the requirement of the contract as to written orders for extras in excess of $500 had been

nullified—then the defendant's assertion that he honestly believed the claims to be just would have far greater merit than could be based upon the testimony presented by him upon his trial. The law being that the defendant cannot be convicted if he honestly believed that he was justified in making the $2,960 estimate (People v. Neff, 191 N. Y. 210, 83 N. E. 970), and as these letters and documents have a direct bearing upon the situation presented to him at the time he made such estimate, it is very clear that if they are genuine he ought in fairness to have a new trial.

[2] Are these letters and documents genuine? Engineer Fairchild was sworn upon the hearing of this motion. He testified that the signatures to the various letters purported to have been signed by him appear to be his genuine signatures, but because of the character of the communications he knows he never signed such papers. Evidence has been submitted to the effect that all the letters except the Allen letter have been tampered with. It is asserted that chemicals have been used to erase some writing and lines above the signatures; that the washed sheets have been soiled, soaked with dirty water, and, after being thus prepared, the present typewritten contents have been written thereon just above the genuine signatures. It is said that the letter from Savage & Co., to defendant, declining to submit to the estimate of March 28th and threatening to sue the town, the letter of Engineer Fairchild to Savage & Co., the approval by Engineer Fairchild of the claim of $4,272, and the letter of Fairchild to Murphy, saying that the requirement of the contract for written orders for extras before doing the work had been nullified, were all written on the same typewriter, though purporting to have been written at different places and offices, in Canada and Erie county. All these letters seem to have been soaked with water, soiled, mussed, and some almost illegible. It is contended that this condition was brought about to conceal the fact of their being newly manufactured, instead of newly discovered. The Allen letter to the defendant is apparently in good condition, though somewhat soiled, and seems to have been wet with dirty water. It unquestionably bears the genuine signature of the town attorney.

To the novice it seems an impossibility to eradicate all the lines and pen and ink written matter from a sheet of letter paper, except the signature, with no trace of the writing or lines left, to the end that any communication may be typewritten above such signature, leaving the paper with the appearance of having first been used for the typewriting and signature. The testimony of the witness Osborne that such had been the treatment of the paper upon which now appear the Battles and Fairchild letters seemed very far-fetched and quite an impossibility. The defendant's attorneys argued that such a treatment and result was unbelievable, and to test their sincerity in this belief they furnished a sheet of Laurence Savage & Co. letter paper upon which had been written a letter dated April 9, 1908, to the Buffalo Forge Company, covering the first page and signed Laurence Savage & Co., per James Battles, together with a commercial ink eradicator, and stated that they had experimented with such eradicator and sub-

mitted the result of their work, which clearly showed that they were unable to do any of the things testified to by Mr. Osborne. With these means at hand and with no especial pains it was an easy matter to wash and entirely eradicate from this sheet the last four or five lines of pen and ink writing and all the blue lines on both sides of the paper, leaving the signature quite distinct. From this simple experiment, with no previous experience or familiarity with using acids on sized paper, with no knowledge as to the proper coloring of the water with which to rinse or wash the paper, after eliminating the blue, ruled lines and ink-written matter, for the purpose of simulating the effect of smoke and dirty water on the paper, the satisfying conclusion is at once reached that with experience and skillful care, with the delicate touch and accurate, steady hand of a professional user of ink eradicators, or of one accustomed to the precise and certain work of, and possessed of the knowledge of, a skilled draughtsman, it would be perfectly practicable and feasible to eliminate from this sheet of paper all of the writing and ruled lines, and prepare the paper by use of chemicals, dirty water, and intelligent handling so that it could not be distinguished as to color, texture, and condition from the paper on which the Savage and Fairchild letters are written. This sheet of Laurence Savage & Co. letter paper, thus experimented upon, was before the application of the ink-eradicating acids one-quarter of an inch longer and one-eighth of an inch wider than the Battles letter paper of the same printed heading of March 27, 1908. After the application of the acid the lower end of this sheet, covering the space of the removed writing, has shrunk one-eighth of an inch in width. If the test had been made to the entire sheet, it is apparent that the same relative shrinkage in length would have occurred, thus substantiating the contention of witness Osborne that the sheet of paper on which is written the Battles letter of March 27, 1908, has shrunk from its original proportions by use of acids upon it. The sheet of letter paper with the Laurence Savage & Co. heading, dated April 9, 1908, submitted for experiment, has the same printed matter, type, and spacing as appears on the Battles letter of March 27, 1908. It was ruled on both sides with blue lines for penwriting and sized to a glossy writing surface. After the application of the chemical, the gloss disappeared, as well as the ruled lines and ink-written words; and the character of the paper appears to the natural eye and under a magnifying glass to be precisely the same as the paper on which is now written the Battles letter of March 27, 1908, surely indicating that the Battles letter of March 27, 1908, is now written on paper that once had a glossy surface, was ruled on both sides for pen writing, and was one-quarter of an inch longer, and one-eighth of an inch wider, than it now is.

The fact that the attorneys for the defendant supplied the court with the ink eradicator and the Buffalo Forge Company letter of April 9, 1908, showing upon its face their inability to make any success in eliminating the pen and ink writing, forces the welcome conclusion that they have absolute faith in their contention that it was an impossibility for their client or any one in his behalf to prepare the paper upon which the Fairchild and Battles letters now appear to be written,

by use of acids, washing, coloring, etc., for use in typewriting the communications now appearing thereon. It is very gratifying to know that they in no way are responsible for or cognizant of the duplicity and fraud practiced by the manufacturing of what they were justified in treating as newly discovered evidence. Many places in the disputed letters of Battles and Fairchild show plainly the effect of acid upon them. The conclusion is reached, after a very careful and exhaustive study of the appearance and condition of these letters, that they have been tampered with, and that it was not accident that caused their present condition. They are not genuine letters of the apparent writers, and the denial of Engineer Fairchild that he ever signed his name to such communications is accepted as the truth. If it be true that Savage & Co. by James Battles ever wrote the letter of March 27, 1908, to Murphy, criticising the rejection of the claim for extras on March 26, 1908, and threatening to sue the town of West Seneca for $4,272, it is inconceivable that Battles would ever, after that date, decline to admit the writing of such a letter. The subject of these letters is utterly inconsistent with the testimony of Murphy on his trial. He stated many times on his trial that the subject of written orders for the extras was never discussed by himself, Fairchild, and Getman; he states that such subject was never discussed at all. If he then had letters in his possession, as he now claims, during the period from March 27th to April 8th, it is inconceivable how he would have so testified; the most important thing in these letters is about such written orders. If he had these letters in his possession, affording ample justification for approving the claim for extras, it is impossible to believe that he would have told Supervisor Lein, when asked for an estimate to help him out in his short accounts, that he would have to look around and find something, as there was nothing on hand that could be used for such a purpose. If he had these letters in his possession, it is unbelievable that he would have told District Attorney Abbott that he made the estimate for $2,960 because members of the town board were importuning him so to do. If he had these letters in his possession, it is unbelievable that he would have told Supervisor Lein and Contractor Savage that they were asking him to permit them to make a plain steal from the town of West Seneca, by approving these claims. If he had these letters in his possession, it is unbelievable that he would have sat through the Savage trial and permitted his conviction for grand larceny. If he had these letters in his possession, that he would have sat through the Lein trial, and heard Savage testify that there was nothing to these claims for extras; that the work upon which they were based was all performed by the contractors for their own benefit and took the place of work required by the contract. Savage testified on the Lein trial that the alleged extra concrete was put in place, instead of timber forms; that the contract required timber forms on outside of concrete wall; that the excavation was too narrow to insert the forms; and that this concrete was filled in to the edge of the excavation, dispensing with the forms, with which method the town had nothing to do. A word from Murphy that he had such letters would have prevented Lein's conviction.

It is absolutely impossible to believe that Murphy had these letters in his possession at the time of his trial, or that he had ever heard of them. An examination of the entire record of his trial does not reveal a suggestion that he had any such vital communications. On his trial he was pressed hard to show that he was in any possible manner justified in making such estimates; not a syllable from his lips concerning such letters, and, whenever he does touch a subject that is now referred to in these crucial letters, he testifies in a manner and upon a theory that is entirely antagonistic to the contents of the same. He now says that he forgot all about these letters. It will not do for him to state to District Attorney Abbott that he signed the estimate because he was importuned by the town board so to do, and now claim that he has discovered proof that he signed the estimates in the honest belief that the claim was just and fair. It will not do for him to say to Supervisor Lein, on April 7, 1908, that to approve of Savage & Co.'s claim for extras would be a plain steal from the town of West Seneca, and now assert that at that time he had documentary proof that the claim was a legitimate one against the town. The trial lasted more than a week, and early during the period of that trial it clearly appeared that the question of defendant's guilt or innocence would depend upon his justification in making the estimate complained of. No diligence whatever has been shown to produce these vital letters at that time. The defendant is bound to satisfy the conscience of the court that his failure to produce this alleged newly discovered evidence at the time of his trial was not owing to a want of diligence. The Fairchild and Battles letters being spurious, and the attempt having been made to foist them on the court as newly discovered evidence, it is no violation of any conscientious scruple to reach a conclusion that the failure to produce the Allen letter or the Getman estimate on the trial was owing to a want of diligence, even assuming that they were then in existence and in defendant's possession. The fact that must be accepted, that the Fairchild and Battles letters are forgeries, stamp the attempt to secure a new trial upon the ground of newly discovered evidence as possessing no merit.

The motion is denied.